UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DEBRA J. KNIGHT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:13-CV-1191 (CEJ) |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. **Procedural History**

On October 20, 2010, plaintiff Debra Knight filed applications for a period of disability, disability insurance, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of March 31, 2007, which was also the last date of her insured status.[1] (Tr. 166-78). After plaintiff's applications were denied on initial consideration (Tr. 115), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 125-26).

Plaintiff and counsel appeared for a hearing on February 29, 2012. (Tr. 68-107). On May 25, 2012, the ALJ issued a decision finding that plaintiff was not disabled before March 31, 2007. (Tr. 10-25). The Appeals Council denied plaintiff's request for

---

[1]Plaintiff previously filed an application on November 13, 2008, also alleging disability beginning on March 31, 2007. That claim was initially denied on March 5, 2009, and was not appealed. The ALJ reopened the earlier claim upon a finding of good cause. See ALJ Decision. (Tr. 10).

review on May 8, 2013. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 194-201), plaintiff listed her disabling conditions as fybromyalgia; severe widespread muscle pain, tenderness, and weakness; chronic fatigue syndrome; depression, malaise and anxiety; significant short-term memory loss; difficulty concentrating and focus; osteoarthritis; residuals of past back injury; neck pain and immobility; and sleep apnea. Between 2002 and 2008, she held jobs as a cashier, child care worker, envelope stuffer, school kitchen worker, and teacher's aide. (Tr. 197). When the applications were filed in 2010, plaintiff's medications included Ampheta S/Combo,[2] Cymbalta,[3] Hydrocodone/APAP,[4] and Propranolol.[5] (Tr. 241).

---

[2]Adderall, or Amphetamine Salt Combo, is a combination of stimulants (amphetamine and dextroamphetamine) and is used to treat attention-deficit hyperactivity disorder and narcolepsy. http://www.webmd.com/drugs/drug-63164-Adderall+XR+Oral%2F.aspx?drugid=63164 (last visited May 13, 2014) and http://www.pdrhealth.com/drugs/adderall (last visited on May 13, 2014).

[3]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[4]Hydrocodone/APAP, or Lortab, is a combination of Acetaminophen and hydrocodone bitartrate, a semisynthetic narcotic analgesic, indicated for the relief of moderate to moderately severe pain. See Phys. Desk Ref. 3314-15 (60th ed. 2006).

[5]Propranolol is used to treat high blood pressure, abnormal heart rhythms, heart disease, pheochromocytoma (tumor on a small gland near the kidneys), and certain types of tremor. It is also used to prevent angina (chest pain) and migraine headaches. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682607.html (last visited May 13, 2014).

Plaintiff completed a Function Report on December 16, 2008. (Tr. 254-66). She wrote that she was extremely stiff upon waking and felt too ill to eat breakfast. She required two to three hours to perform personal care and often required her husband's help to dress. She usually attempted one household chore, such as making her bed or doing laundry, but experienced extreme fatigue, chest pain, and shortness of breath if she exerted herself for more than 15 minutes. She described her sleep as very restless, due to pain from staying in one position. (Tr. 255-56). Throughout the day she walked from room to room, skimmed magazines, and watched birds from her deck. Reading and watching television put her to sleep. "Real cooking" took her 3 to 4 hours, so her husband usually cooked the evening meal. She drove to the bank or post office once or twice a month, but driving longer than 15 minutes caused pain and fatigue. She accompanied her husband to the grocery store. Her husband paid the bills, but plaintiff was able to manage bank accounts and count change. She needed reminders to take her medicine. She was no longer able to complete yard work, walk outdoors, paint, or read. She spent time with family members but found socializing with friends to be too taxing. Plaintiff had difficulties with lifting, bending, standing, squatting, reaching, walking, sitting, kneeling, climbing stairs, using her hands, completing tasks, understanding, following instructions, memory and concentration. She no longer handled stress well. She required a raised toilet seat and elevated counters to make attending to her personal care less taxing.

Plaintiff's Work History Report shows that she was employed doing factory assembly work for 19 years, until March 1999. Starting in 2002, she held a series of short-term jobs, working in a high school kitchen (2002), as a cashier at Wal-Mart (2002), as a secretary for Kelly Services (2005), a teacher's aide (2003), and in a day

care center (2008). (Tr. 246). Plaintiff wrote of her work at the day care center, "They always asked me to work full time. I told them it was not physically possible for me. . . [T]he woman I worked with . . . would do all the lifting of the babies – she could hand them to me, then I could bottle feed them [and] rock them to sleep." (Tr. 232). Her co-worker wrote that she helped plaintiff lift the children because plaintiff was afraid she would drop them. "She hurt all the time in her arms and legs." (Tr. 245).

### B. Testimony at Hearing

Plaintiff testified that she graduated from high school. (Tr. 99). She resided with her husband, who was retired and received a pension and Social Security. (Tr. 70-71). She had previously worked assembling small electrical units. (Tr. 91).

The ALJ explained that the medical information in the present record did not date back to March 2007, the date on which plaintiff was last insured. (Tr. 75, 77). Therefore, the ALJ retrieved the medical records associated with the prior claim.

Plaintiff testified that she was in too much pain from fibromyalgia "to do anything at all anymore." (Tr. 77). The pain caused her to toss and turn while sleeping and she estimated that she slept between three and five hours a night. A sleep study established that she had sleep apnea. When questioned by the ALJ, plaintiff acknowledged that she did not follow through with treatment for the condition but explained that she did not have health insurance and so was often unable to comply with some recommendations. (Tr. 83-84).[6]

---

[6]Plaintiff had been insured through her husband's employer. When he retired, she extended her coverage through COBRA until it expired.

When asked what she did during the day, plaintiff responded, "Not a lot." She sat around, got up and walked, and sat again. She did some light housework, but her husband took care of most tasks. (Tr. 100). She was able to make sandwiches but it took her six hours to cook a meal the last time she attempted to do so. She was able to do laundry, but her husband had to carry it up and down the stairs for her. Watching television put her to sleep and she did not read because her vision was blurry. (Tr. 102-03). She did not use a computer. She occasionally went grocery shopping but otherwise did not go anywhere, which she found upsetting.

When she worked as an assembler, plaintiff stood all day and lifted 20 pounds occasionally and 75 pounds infrequently. (Tr. 91-92). The work became too physically demanding for her to continue. She testified that she was crying at work and had incidents "like passing out." Once, an ambulance was called because she thought she was having a heart attack. She continued to have "really bad chest pains" in which her chest got really tight and she experienced pain. It made her very frightened. (Tr. 92). Her physician told her that the chest pain might be due to the fibromyalgia, because she apparently did not have a cardiac condition. She took Propranolol to treat the chest pain. After leaving her position with the factory, plaintiff worked as a retail sales clerk, daycare provider, envelope stuffer, kitchen helper, teacher aide and a poll worker. (Tr. 95-96). These positions did not rise to the level of substantial gainful employment. (Tr. 12).

Delores Gonzalez, M.Ed., a vocational expert, provided testimony regarding plaintiff's past work. Ms. Gonzalez testified that plaintiff's work as a retail sales clerk is classified as light and semi-skilled; the day care worker position is classified as light

and semi-skilled and has a Specific Vocational Preparation (SVP) level of 4[7]; envelope stuffer is classified as light and unskilled with an SVP of 2; kitchen helper is medium and unskilled with an SVP of 2; teacher aide is light and semi-skilled with an SVP of 3; and production assembler, as plaintiff performed it during the relevant period, is light and unskilled with an SVP of 2. Ms. Gonzalez identified customer service as a transferable skill that could be performed at the sedentary level as a telephone customer service representative or receptionist. (Tr. 99).

### C. Medical Records

Plaintiff's discussion of the medical records begins in June 2005. Prior to that date, she was diagnosed with mild mitral valve prolapse (Tr. 430), chronic fatigue syndrome, and fibromyalgia (Tr. 382, 396, 370). She periodically complained of tightness in her chest, feeling light-headed, neck pain, shortness of breath, and pedal edema. (Tr. 430, 342, 341, 380, 340). She consistently reported fatigue, tenderness and swelling of the joints, irritable bowel, and gastroesophageal reflux disease. (Tr. 344, 338, 377, 339). Her primary care physician, Rosemary Cannistraro, M.D., Ph.D., occasionally noted that the muscle beds were tender to palpation. (Tr. 382, 375). In November 2004, plaintiff underwent a sleep evaluation and was diagnosed with obstructive sleep apnea and psychophysiologic insomnia. (Tr. 371, 368-69, 365).

---

[7]The SVP level listed for each occupation in the Dictionary of Occupational Titles (DOT) connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010). At SVP level 2, an occupation requires more than a short demonstration but not more than one month of vocational preparation; level 3 covers occupations that require over 30 days and up to and including 3 months; level 4 covers occupations that require over 3 months and up to and including 6 months. 20 C.F.R. § 656.3.

In June 2005, plaintiff's medications included an antidepressant, Propranolol for chest pain, Ultram,[8] and Flexeril.[9] (Tr. 318). In January 2006, Dr. Cannistraro noted that plaintiff's "antidepressant [was] not working," that she "hurts all over" and "sleeps all the time," and had some anxiety. (Tr. 335). Dr. Cannistraro noted diffuse tenderness on examination. In addition, plaintiff complained of abdominal pain, headache and dizziness. Dr. Cannistraro recommended a trial of Cymbalta to help with pain. In February 2006, plaintiff reported some improvement with Cymbalta, though she still suffered poor quality sleep. Dr. Cannistraro reviewed the risks of untreated sleep apnea and strongly recommended that plaintiff get a CPAP machine. Dr. Cannistraro also increased the dosage of Cymbalta to 120 milligrams. (Tr. 334). In March 2006, plaintiff reported that although she felt "mentally much better" on the increased Cymbalta, her pain was still "bad." She was unable to babysit and had tried working at Wal-mart but felt pain when lifting bags. She could not sit or stand all day. She had swollen joints in her hands and tenderness all over. Dr. Cannistraro noted that plaintiff "may need to go on disability but is best served by being [illegible] with full [treatment plan]." (Tr. 333). Plaintiff began taking Adderall in March 2006. (Tr. 233).

In April 2006, plaintiff complained that she felt "terrible" and "hurt[] all over." She was not sleeping at all and had pain in her ribs which hurt when she moved. She

---

[8] Ultram is a centrally-acting synthetic opioid indicated for management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of pain for extended periods of time. See Phys. Desk. Ref. 2428-29 (63rd ed. 2009) (discussing extended release product).

[9] Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1832-33 (60th ed. 2006).

-7-

had joint swelling and diffuse tenderness in her ribs, hands, and feet; depression; fatigue; and headache. Dr. Cannistraro noted that plaintiff was suffering an exacerbation of the symptoms of chronic fatigue syndrome and fibromyalgia, with generalized malaise. (Tr. 332). A chest x-ray was unremarkable. (Tr. 349). In May 2006, plaintiff reported an improvement in her symptoms, including improved sleep and energy. (Tr. 331). She had started exercising which caused some shortness of breath. In August 2006, Dr. Cannistraro noted that plaintiff continued to show improvement, writing that "Adderall has really helped fatigue and given some quality of life." (Tr. 330). The fatigue and fibromyalgia were "in remission" and plaintiff felt "better focus." Medication records indicate that plaintiff's dosage of Adderall increased in August 2006. (Tr. 234).

In January 2007, Dr. Cannistraro noted that plaintiff's fibromyalgia and chronic fatigue syndrome were "significantly improved" with the addition of Cymbalta and Adderall. (Tr. 329). Her fatigue was "much better" and "this is best" plaintiff had felt "in years." In March 2007, plaintiff continued to report improvement. She stated that she had taken a trip to Texas and driven to the border where she walked across a bridge over the Rio Grande. (Tr. 328). However, plaintiff told Dr. Cannistraro that the Cymbalta was too expensive and medication records reflect a decrease in her dosage. (Tr. 234).[10] In August and November 2007, Fluoxetine [11] was listed among plaintiff's medications. (Tr. 326, 324).

---

[10] On August 25, 2006, plaintiff paid $30.00 for 60 tablets of Cymbalta. The next time she filled her prescription, she paid $111.75 for 30 tablets. (Tr. 234).

[11] Prozac, or fluoxetine, is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

In the following months, plaintiff reported that she felt more pain and was having trouble sleeping as a result of weaning off Cymbalta. (Tr. 324-27). In February 2008, Dr. Cannistraro noted that plaintiff was experiencing increased depression, worsened pain, more fatigue, decreased endurance, and sleep disorder, and had multiple myalgias, numbness, and chest pain. (Tr. 323). A stress echocardiogram was normal. (Tr. 451). In April 2008, Dr. Cannistraro noted that plaintiff's fibromyalgia was exacerbated and provided some samples of Lyrica.[12] (Tr. 321). In July 2008, Dr. Cannistraro noted that plaintiff was suffering from severe fatigue and spasms, after trying "too much lifting." (Tr. 320). The doctor noted that plaintiff sometimes worked for the "s[chool] d[istrict]" and collapsed with exhaustion at the end of the day. Her pain and fibromyalgia were "bad, [causing] aches all over." Dr. Cannistraro opined that plaintiff could not tolerate working 8 hours at a time. In October 2008, plaintiff presented with shortness of breath, fatigue, muscular weakness, joint swelling and tenderness.

In January 2009, plaintiff complained of shortness of breath, chest pains, and joint tenderness. (Tr. 291). In March and May 2009, plaintiff complained of joint pain and body aches. In July 2009, plaintiff was in a lot of pain; her hands were swollen and painful, and she had diffuse tenderness of the joints. She reported being unable to walk during the prior month. Dr. Cannistraro described her as fretful and crying. Dr. Cannistraro prescribed Savella[13] and Salonpas patches.[14] (Tr. 294). In August

---

[12]Lyrica, or Pregabalin, is an anticonvulsant indicated for the treatment of neuropathic pain and postherpetic neuralgia and for the management of fibromyalgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html (last visited on Mar. 9, 2011).

[13]Savella is the brand name for Milnacipran, a selective serotonin and norepinephrine re-uptake inhibitor indicated for the management of fibromyalgia.

2009, Dr. Cannistraro referred plaintiff to a pain clinic and suggested she try to exercise. (Tr. 295). Plaintiff's condition did not show improvement throughout 2009 and 2010. (Tr. 291-304). In August 2010, Dr. Cannistraro recommended that plaintiff see a counselor to help her deal with stress. (Tr. 302).

Dr. Cannistraro completed a Physical Residual Functional Capacity Questionnaire on September 20, 2010. (Tr. 274-78). Dr. Cannistraro described plaintiff's symptoms as muscular weakness and tenderness in legs, hands, and arms. She further stated that plaintiff "flinche[d] with pain at slight touch in these areas." She "has experienced widespread pain in all four quadrants." In response to a question asking her to identify the clinical findings and objective signs supporting her assessment, Dr. Cannistraro wrote: "fibromyalgia osteoarthritis, malaise and fatigue, chronic fatigue syndrome, sleep apnea." In response to a question about treatment and side effects, Dr. Cannistraro wrote "Fibromyalgia has caused patient to be debilitated, suffering from weakness, pain all over, and fatigue." Plaintiff's pain was likely to "frequently" interfere with attention and concentration and she was incapable of performing even low-stress work. Plaintiff's impairments were expected to last 12 months or more and her depression and anxiety contributed to the severity of her symptoms. Dr. Cannistraro did not respond to a question asking whether plaintiff was a malingerer. (Tr. 274-75). She also declined to answer any of the questions regarding plaintiff's functional limitations, writing that she was "unable to evaluate."

---

http://www.nlm.nih.gov/medlineplus/druginfo/meds/a609016.html (last visited on Sept. 1, 2011).

[14]Salonpas pain relief patches provide topical pain relief. See http://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/022029TOC.cfm (last visited on May 13, 2014).

-10-

Dr. Cannistraro completed a second Residual Functional Capacity Questionnaire on January 25, 2012. (Tr. 310-14). She noted that she saw plaintiff for one hour every 6 to 8 weeks. Plaintiff's diagnoses included fibromyalgia, irritable bowel syndrome, osteoarthritis, hypertension, esophageal reflux, and chronic pain syndrome. Plaintiff's symptoms included multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, episodic subjective swelling, vestibular dysfunction, numbness and tingling, Sicca symptoms, Raynaud's phenomenon, breathlessness, anxiety, depression, and chronic fatigue syndrome. This time, Dr. Cannistraro stated that plaintiff's emotional symptoms did not contribute to the severity of plaintiff's limitations. Plaintiff experienced pain all of the time, precipitated by changing weather, movement or overuse, cold, and stress, and was "ok" only two days a month. Dr. Cannistraro opined that plaintiff was able to walk one block; sit or stand for 5 minutes before needing to change position; sit less than 2 hours in an 8-hour day; walk or stand not at all; would have to walk every five minutes for about 2 minutes; and would need to take 10 breaks during an 8-hour day. In addition, plaintiff needed to elevate her legs to waist level when sitting. Plaintiff was restricted to rarely lifting less than 10 pounds and never lifting anything heavier, and she could rarely use her hands for grasping, fine manipulation, or reaching. Her impairments could be expected to cause more than 4 absences per month. Plaintiff's symptoms and limitations had been present since June 2005.

Dr. Cannistraro explained the difference between her responses to the two questionnaires by saying: "I saw the patient in the office on 1-23-12 and completed the form while I examined the patient. The form on 9-20-[10] was completed 3 weeks after a visit with the patient and was not addressed during the visit." (Tr. 443).

## III. The ALJ's Decision

In the decision issued on May 25, 2012, the ALJ made the following findings:

1. Plaintiff last met the insured status requirements of the Social Security Act through March 31, 2007.

2. Plaintiff did not engage in substantial gainful activity as of March 31, 2007. Her work after that date did not rise to the level of substantial gainful activity.

3. Through March 31, 2007, plaintiff had the following severe impairments: chronic fatigue syndrome and fibromyalgia.

4. Through March 31, 2007, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Through March 31, 2007, plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c).[15]

6. Through March 31, 2007, plaintiff was able to perform her past relevant work as a production assembler and retail sales clerk.

7. Plaintiff was not under a disability within the meaning of the Social Security Act as of March 31, 2007, the alleged date of onset and the date she was last insured.

(Tr. 12-25).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145,

---

[15]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c).

1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or

mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental

demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff challenges the ALJ's determination that she retained the RFC to perform medium work, arguing that the ALJ improperly discounted the opinion of her treating physician and failed to support the RFC determination with medical evidence. She also argues that the ALJ did not present a proper hypothetical to the vocational expert.

### A. The RFC Determination

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC

-15-

remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

### 1. Dr. Cannistraro's opinion

In reaching the RFC determination, the ALJ gave little weight to the opinion of Dr. Cannistraro, plaintiff's treating physician. Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding. Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012); (citing 20 C.F.R. § 404.1527(c)(2)). Indeed, when the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. Id. "However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (alteration in original) (internal quotation omitted). Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). An ALJ may not substitute his own opinions for the opinions of medical professionals. Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (ALJ erred in substituting his opinion that plaintiff did not seem depressed at hearing for doctor's assessment of plaintiff's mental health); see

-16-

also Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) (ALJs may not "play doctor"); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

The ALJ gave multiple reasons for discounting Dr. Cannistraro's opinion. However, the ALJ's analysis failed to take into account the nature of fibromyalgia. Fibromyalgia's symptoms typically include sleep deprivation, fatigue, and pain, and are largely subjective. Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004); Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009). The disease is chronic, and "[d]iagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests." Brosnahan v. Barnhart, 336 F.3d 671, 672 n. 1 (8th Cir. 2003). The ALJ discounted Dr. Cannistraro's opinion because her treatment records did not reflect any objective findings, such as limited range of motion, weakness, swelling, warmth, or other signs which would support restrictive exertional and postural limitations. The objective findings the ALJ was looking for in this case are not always present in patients diagnosed with fibromyalgia. Fishbaugher v. Astrue, 878 F. Supp. 2d 939, 955 (D. Minn. 2012) (citing Sarchet v. Chater, 78 F.3d 305, 308 (7th Cir. 1996)). In addition, "fibromyalgia often leads to distinct sleep derangement which often contributes to a general cycle of daytime fatigue and pain." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). Plaintiff routinely reported that she suffered from poor sleep and fatigue, for which no objective signs exist.

The ALJ's analysis was inaccurate with respect to some of the medical evidence. For example, the ALJ incorrectly stated that the treatment records did not include findings of swelling or numbness. The treatment notes reflect that swelling was present on multiple occasions between 2003 and 2007, (Tr. 342, 240, 339, 387, 332,

323), and numbness was present in February 2008 (Tr. 323). The ALJ also stated that Dr. Cannistraro never prescribed pain medications. (Tr. 21). The record shows that plaintiff was prescribed Ultram and Flexeril in June 2005 (Tr. 318); Savella and Salonpas in July 2009 (Tr. 294); and Gabapentin in May 2010 (Tr. 301). Starting in 2006, plaintiff was prescribed Cymbalta and Adderall to treat the symptoms of fibromyalgia and chronic fatigue syndrome, including pain. (Tr. 387, 331).

The ALJ also noted that Dr. Cannistraro never directed plaintiff to restrict her activities and, indeed, encouraged her to exercise. (Tr. 19). A physician's recommendation of exercise to a patient with fibromyalgia is not necessarily inconsistent with a finding of disability. See Brosnahan v. Barnhart, 336 F.3d 671, 678 (8th Cir. 2003) (distinguishing between exercise within the limits of a functional capacity evaluation and capacity to engage in substantial gainful employment). Similarly, the ALJ stated that Dr. Cannistraro's opinion that plaintiff had been disabled since 2005 was undermined by the brief periods of employment that plaintiff held following that date. However, plaintiff held these positions for very short periods of time and, in April 2006, she told Dr. Cannistraro that she was unable to sustain her employment in daycare and at Wal-Mart due to her pain. (Tr. 333).

Based on the above, the Court finds that the ALJ did not "give good reasons" for discrediting the opinion of Dr. Cannistraro. 20 C.F.R. § 404.1527(c)(2).

### 2. "Some" Medical Evidence

Plaintiff argues that the ALJ improperly failed to support the RFC determination with citation to any medical evidence, relying on Lauer v. Apfel. 245 F.3d 700, 704 (8th Cir. 2001). "[S]ome medical evidence," must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the

-18-

claimant's "ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citations omitted). This is not a case in which different treating doctors have offered varied opinions. Tilley v. Astrue, 580 F.3d 675, 680 (8th Cir. 2009). The only medical opinion evidence was provided by Dr. Cannistraro, who opined that plaintiff was incapable of all work related activities. Once the ALJ rejected that assessment, there was no other medical evidence in the record from which the ALJ could have ascertained that plaintiff has the RFC to perform medium work.

Defendant argues that the ALJ's RFC determination is supported by evidence in the record showing that plaintiff experienced temporary improvement on the date she was last insured. On January 24, 2007, plaintiff reported that her chronic fatigue syndrome and fibromyalgia had significantly improved once she began taking Cymbalta and Adderal, and that she was feeling better than she had in years. (Tr. 329). Similarly, on March 21, 2007, plaintiff reported that her fatigue had improved. However, plaintiff's subjective report does not satisfy the requirement of medical evidence to support the RFC.

The RFC determination in this case is not support by substantial evidence in the record and thus the matter must be remanded. On remand, the ALJ should consider whether to obtain the opinion of a consultative examiner to determine whether plaintiff was able to maintain substantial gainful employment on March 31, 2007. Plaintiff's challenge to the testimony of the vocational expert is moot.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2014.